*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN C. MOORE, JR.,

    *Petitioner-Appellee,*

  *v.*

    No. 07-3380

JAMES S. HAVILAND, Warden,

    *Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00242—Lesley Brooks Wells, District Judge.

Argued: March 18, 2008

Decided and Filed: July 15, 2008

Before: BOGGS, Chief Judge; ROGERS, Circuit Judge; SHADUR, District Judge.[*]

---

## COUNSEL

**ARGUED:** Jerri L. Fosnaught, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. J. Dean Carro, UNIVERSITY OF AKRON SCHOOL OF LAW, Akron, Ohio, for Appellee. **ON BRIEF:** Jerri L. Fosnaught, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. J. Dean Carro, UNIVERSITY OF AKRON SCHOOL OF LAW, Akron, Ohio, for Appellee.

 SHADUR, D. J., delivered the opinion of the court, in which BOGGS, C. J., joined. ROGERS, J. (pp. 12-13), delivered a separate dissenting opinion.

---

## OPINION

---

 SHADUR, District Judge. James Haviland, in his capacity as Warden, appeals the issuance of a writ of habeas corpus to John Moore ("Moore") by the district court. In the underlying state criminal proceedings that have given rise to Moore's federal habeas action, he sought to represent himself at trial, but his request was never resolved and he was convicted while represented by appointed counsel. After his conviction was upheld on appeal in the state system, he then turned

---

[*] The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

1

to the federal courts and was awarded a grant of conditional habeas relief. We affirm the judgment of the district court that did so.

## I. Moore's State Criminal Trial[1]

Moore's criminal trial took place in Cuyahoga County Common Pleas Court in September 2000. On the third day of trial Moore's appointed attorney Robert Tobik ("Tobik") informed the trial judge that Moore was displeased with some aspects of his representation and wanted to address the court. Moore had given Tobik a note for the judge expressing that displeasure, but the note was not delivered. Moore then attempted to speak to the judge in open court, but the judge told him that he was not to engage in conversation with the court in front of the jury. Later, when the jury was on break, the following exchange occurred:

> The Court: What's the problem that you can't communicate to the court through your attorney?
>
> Moore: Your Honor, I would like to go on the record to preserve the right to call all witnesses called by the prosecutor. I have many, many questions.
>
> The Court: That's fine. You can call anybody you want.
>
> Moore: I have many questions that I presented to my lawyer to be asked that he did not ask them. Also, I want Fred King and all the codefendants called and put on record whether they take the Fifth or if they--
>
> The Court: You call anybody you want. That's fine.
>
> Moore: Okay. Also, I asked him to have Detective Moran kept out of the room while Detective Maruniak testified because I'm sure there would be inconsistencies between what he was telling us and what I was expecting to get out of Detective Moran.
>
> The Court: There is a motion for separation of witnesses. Anybody who wanted to call a witness here could have the individual subpoenaed and/or announced that they were going to be called and taken out of the courtroom. They leave the courtroom.
>
> Moore: That's my point. Before he got started this morning--see, I noticed in the last one he sat through from beginning to end of Detective Alexander's testimony. From beginning to end Detective Maruniak was present. So, I asked my attorney to make sure that Moran was not present.
>
> The Court: Are you disagreeing with your attorney's tactics?
>
> Moore: I wrote it in a letter to you to make sure you could get it down even if he didn't.
>
> The Court: I haven't seen your letter.
>
> Moore: I know. That was my point. I knew for a fact you hadn't seen it before he--

---

[1] It is unnecessary to recount the specifics of Moore's alleged crimes, for the grant or denial of habeas relief depends solely on occurrences during trial. Appellant's counsel have devoted an inordinate amount of space in their briefs to spell out (in considerable detail) Moore's alleged crimes. We scarcely need to remind lawyers who represent the government at any level that even the meanest members of society also have constitutional rights.

The Court: You know, look.  You have a very experienced trial counsel.

Moore: I understand that, but I feel that--

The Court: Hold it.  When I'm talking, you don't interrupt me.

Moore: I'm sorry.

The Court: He can decide what questions are appropriate and what are not.  Not you.  You can make suggestions to him.  You can urge him to ask questions, but if the question isn't permissible under the rules of evidence or if the question goes into sound tactics of his assessment of the case and what tactics he thinks should be employed, then he is the one who makes that decision as to the specifics of the questions and witnesses.  He may have other witnesses in mind to ask the questions or areas to which you are concerned about.

Moore: My question is this, then what do I have to do to retain or to get my right to make a decision on what questions are asked and who's called and not called?  What do I have to do right now to do that because I feel that I have some very important questions that are not being asked.

The Court: First of all, you could have hired your own attorney.  This attorney has been appointed by the court, by another judge, whoever handled your arraignment.  Now, the court appointed in this case an attorney who's handled murder cases, high level cases, felony one cases with great success, who understands the law and is highly respected in the community.

Now, you could have hired your own attorney or you can go pro se and be your own attorney, which is of course a very dubious action for anybody to take, and I personally, in 28 years as an officer of the court, have never seen anybody successful in that regard.  In fact, I don't even know of a case in the common pleas Cuyahoga County where someone has been successful at a trial acting as their own attorney pro se.  But you always have that option.

Moore: So you are saying that's the only way that I can get all my questions--

The Court: The dream team is occupied here.  We can--

Moore: Can I go pro se?

The Court: --get Johnnie Cochran or F. Lee Bailey.

Moore: Can I go pro se then?

The Court: You want to go at this point--

Moore: You are leaving me with no other option.  You are saying that the only way--

The Court: It is too late for that now.  You have already started with an attorney.  I don't believe you can go mid trial.

Moore: That's what I'm asking.  I asked you what do I have to do.

The Court: I don't think you are in a position to discharge your attorney. You haven't demonstrated any knowledge of the law or willingness to comply with the orders of the court or understanding of the rules of evidence.

Moore: I've tried to get--

The Court: And basic politeness. I will entertain that thought. If you want to put it in writing over the lunch hour, I will instruct the deputies to allow you to have your paper and pencil or pen and allow you to make a written motion if you want to do so over this lunch period and explain to me your plans for trial, your strategy and -- not specific, but your general capability of conducting a trial. I don't see any right now. You would not be in a position to conduct the final argument.

Moore: Can I ask you a question?

The Court: You would be waving [sic] final argument because you would be incapable of presenting what a pro se final argument would have to be. It would be, you know, a very dubious action. Again, I have never seen it happen. It's theoretically possible it could happen where it could be successful. It's theoretically possible that you could. It's possible that you can be hit by a meteor.

Moore: A what?

The Court: A meteor, right? Things that come from space and they invade the earth's atmosphere and they hit the earth on a day-by-day basis. I'm told. I have never seen one, though. Not striking anyhow.

Moore: All I'm asking is for a right to call them witnesses.

The Court: You should discuss that with your attorney.

Moore: And ask the questions, and I'm asking you--

The Court: You should discuss that with your attorney.

Moore: I have over time and time again, but witnesses keep coming and going and the questions that I need asked are not getting asked.

At that point the court then instructed Tobik to proceed. Tobik then made a motion for separation of witnesses and for the exclusion of Detective Moran from the courtroom. After the court granted the motion, this brief colloquy ensued:

The Court: Okay. All right. We got to handle the other case. Have a nice lunch, everybody.

Moore: Do you need this note for the record that I wrote this morning?

The Court: If you want to give the note, hand it up here. The deputy will give it to me.

Moore then conveyed this earlier-prepared note to the trial court:

Your Honor, John Moore would like to go on record to preserve right to call back any or all witnesses called by Prosecutor. I have many, many Q's that I presented to my lawyer to ask but did not. I also want Fred King and all co-defendants called

if prosecutor doesn't.  I also ask that Det. Moran be kept out of court since he'll be called as a witness.

During the lunch break Moore wrote a letter to the trial judge as the judge had asked during the extended colloquy quoted earlier, but no mention was made of it by the trial judge or Tobik until the end of the trial day:

Tobik: Your Honor, if I may, Mr. Moore per your instructions prior to I believe it was ou[r] luncheon break prepared a written statement.  With the court's permission I will review it with him and we can attach it to the record tomorrow morning.

The Court: All right.  You can type it, do whatever you want.  Think about it. Ponder over it and we'll talk about it in the morning.  Before we start, remind me about it.  Okay.  Thank you very much.

Before the jury entered the courtroom the next morning, Moore's attorney brought the letter to the court's attention:

Tobik: Your Honor, I have that letter that you were supposed to get yesterday from Mr. Moore.

The Court: Well, I have the first letter he sent.  Is there another letter?

Tobik: Correct.

The Court: Okay.

Moore: The one you told me to write during lunch.

The Court: Well, send it up when you find it.  That's all.  Defense motion for Rule 29 is overruled.

Tobik: Thank you.  Can I go out and look to see if we have the--

The Court: Here, let me read it.

Instead of the proceedings then turning to the resolution of that subject, the transcript reflects that immediately following that exchange the jury entered the courtroom and Tobik called Moore to the witness stand.  Moore was then sworn in and began his testimony, responding to questions from his attorney.  Here is the unacted-on letter (reproduced verbatim):

Your Honor,
I feel that a lot of my Q's would have promoted facts to my defense of being coerced into making a false confession/statement.  A lot of relevant information which could contrast with the states position are not being brought out due to the Q's not being asked or line of Qing not being followed through to the end.

I believe by asking former witnesses, the fact that a lot of information can be brought to light thru asking the revelavant Q.  Q's to ascertain state of mind of witnesses, intent of witness's and the igsistance of a concerted effort on the police behalf to hid facts and distort truth's.  I have given numerous lead's for Mr. Tobik to follow-up on but none were done in a timely fashion to be used in my defense.

As for closing Arguements if you will give me the perameters by which I have to limit my resessatations & statements of fact I'm sure with a reasonable amount of time (48 hrs.) I could write a full assessment of my strategy as well as the means to deliver it to the jury.  In closing I have tried to comply with all orders of the court and only wish to get both the truth (in full) and my version of events related to the jury before deliberations commence.  I feel that I am in a position to watch but not participate, to witness but not contribute even though I have firsthand knowledge ofentime procedings.  I'm if I may put it in example.  Being expected to fight a championship boxer in a title fight with my left hand tied & my right broken.  I could still fight but the chances of success is zero to none.

I would like to assist Bob Tobik to the best of my abilities and on important matters of strategy & fact toward witnesses & evidence.  But if my contributions will be continueously ignored then I would ask that you allow him to assist me in continueing my defense.  If that can not be accomplished, I ask that you recall past witneses and they be asked Q's I deem relevant and future witnesses & evidence be reviewed to help better form defense.  If none of the before mentioned requests can be granted I ask that you read this entire document into the record and you allow me to proceed pro-se after a reasonable continuance (48 hrs) for sole purpose of reviewing documents in Prosecutor's control and to formulate a full encompassing strategy & to write both closing arguement and formulate Q's to be asked to me when I take [the] witness stand in my defense.  This time will also be used to familiarize myself with the rules, protocols, and procedures of trial.  My final request is that this document not be scrutinized by prosecution until such time as I am prepared to act in my own defense.  I apologize for any inappropriate behavior in the courtroom and will continue to conduct myself in a respectful manner for the duration of trial.

Thank you
John C. Moore
Sept. 14, 2000 1:00 p.m.
Thursday Written on direction of judge Honorable Timothy McGinty

P.S. on pg. #3
I also request that I be allowed to apologize to [the] jury and they be made fully aware of why the earlier incident took place and the resolution [was] decided and why.

Sincerely
John C. Moore

P.S. II
This should in no way reflect negatively on Mr. Robert Tobik who I hold in high regard and respect immensely.  I just feel my defense should be handled a little differently and since the eventual outcome will impact me the most that I should have input into strategy & decision making [it] part of my defense.

Well into Moore's direct testimony, the trial judge held a sidebar regarding a hearsay objection and raised the contents of the letter to the prosecutor and Moore's defense counsel:

The Court: Now, while we're at the side bar, we have -- whatever you think is necessary in the defense.  I have a letter from him in which he vacillates the letter given to me a minute ago.

Tobik: I believe he also asked you not to share that with the prosecutor.

Prosecutor: Of course the prosecutor demands to see that letter.    It is a communication to the court.  I demand that I see it.

The Court: You don't see that that would compromise any defense strategies here? It has the potential for doing so.  But, he wants to participate in closing arguments. He doesn't specifically ask to take over his own defense.

Tobik: I think he does.  He wants to take over from that point.

The Court: He wants to and he later says he would like to go pro se, but I'm not sure. He wants to go as cocounsel apparently, but, he got up on the witness stand so I don't know if that's an abandonment of what he just gave me beforehand or what.

Anyway, we will discuss it with him.  We told him in the last trial, and I told him in this trial he is allowed -- I will give him a chance to make a speech at the end of your examination.  If he wants to make a statement outside of what he said, he can but he is subject -- I'm sure you advised him he is subject to cross-examination and will be subject to all the rules of evidence and all the doors he may open on himself.

Tobik: I think--

The Court: That's the danger of making such a statement.

Tobik: Right.  You know, of giving a speech, but he can do so if he wants.

Tobik: I think he understands the procedures and the rules in the court and, you know, I think he would be responsive to both my questions and Mr. Mahoney's questions.

The Court: We will inquire of him later on again to see where he is at.  I can't make heads or tails from that letter, the combination of the letter and his actions here getting up on the witness stand.

After direct and partial cross-examination of Moore, the court called for a break.  During that break this dialogue occurred outside the presence of the jury:

The Court: Have a seat, everybody, please.  Now, the court received your letter here this morning.  I read it after you got on the witness stand, Mr. Moore, and you have asked a couple of things.  I'm not quite sure what you want, but you wanted a chance to address the jury.  The court would certainly give you that.  You had the chance. Your attorney asked is there anything you wanted to say.  You gave your statement. That is what you are looking for.  Do you want to impress the jury again at end of this?

Moore: I think it's appropriate in light of I interrupted the proceedings.

The Court: You want to address the jury and apologize you said for interrupting the proceedings?

Moore: Right.

The Court: Okay. Well, that's fine. You can do that. I will allow you to do -- you would have a redirect. You can ask him the question if he has something to say to the jury.

Moore: Not just the jury. It was you, too.

The Court: Your apology is accepted here. You don't have to apologize to me in front of the jury. Now, if you want to do it to the jury, it's your business. I don't care about it or you can ask that open-ended question. Again, that would subject you to cross-examination for whatever you say of course.

Tobik: Your Honor--

The Court: So you talk it over and whatever you want to do, that's fine. Okay. Have a nice break here.

When the jury returned, an officer in the Scientific Investigation Unit of the Cuyahoga County Sheriff's Department was examined and then the court took a lunch break. After the lunch break the prosecutor continued with cross-examination of Moore. Upon completion of redirect and recross-examination of Moore, the defense rested. Tobik presented Moore's closing argument. No further mention of Moore's letter or request to proceed pro se appears in the trial transcript. Moore was found guilty by the jury on the three counts against him.

Moore's conviction was affirmed by the Court of Appeals of Ohio (although the imposition of consecutive sentences was reversed and remanded for resentencing), and the Supreme Court of Ohio denied leave to appeal. Moore then petitioned for a writ of habeas corpus from the United States District Court for the Northern District of Ohio. Adopting the magistrate judge's Report and Recommendation, the district court granted Moore a conditional writ of habeas corpus, subject to retrial by the state, grounded in the denial of his right to self-representation. Warden Haviland filed a timely notice of appeal to this court.

## II.  Standard of Review

We review a district court's legal conclusions in a habeas petition de novo (*King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006)). Although findings of fact are usually reviewed for clear error, "when the district court's decision in a habeas case is based on a transcript from the petitioner's state court trial, and the district court thus makes 'no credibility determination or other apparent finding of fact,' the district court's factual findings are reviewed de novo" (*Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir. 2000), quoting *Moore v. Carlton*, 74 F.3d 689, 691 (6th Cir. 1996)). We assume factual findings of the state court are correct unless controverted by convincing contrary evidence (*Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005)).

Under 28 U.S.C. §2254(d)("Section 2254(d)") it is appropriate to grant a prisoner's habeas petition if the adjudication of the claim in the state court system:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Some elaboration of those alternatives will better focus the analysis.

First, law is "clearly established" from "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision" (*Williams v. Taylor*, 529 U.S. 362, 412 (2000)). As for the statutory requirement that the state decision be "contrary to" such "clearly established" federal law, that condition is satisfied "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts" (*id.* at 413).

Second, "unreasonable application" of clearly established federal law occurs "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" (*id.*). Merely erroneous or incorrect application of clearly established federal law does not suffice to support a grant of habeas relief. Instead the state court must be objectively unreasonable as well as erroneous in its application of clearly established federal law (*id.* at 409-11).

### III. Constitutional Right to Self-Representation

Although courts are most frequently called upon to deal with and to enforce the Sixth Amendment guaranty that every criminal defendant facing potential incarceration has the right to counsel at all "critical stages" of the criminal process (*United States v. Wade*, 388 U.S. 218, 223-27 (1970); *Argersinger v. Hamlin*, 407 U.S. 25 (1972)), the Constitution also affords--with equal importance--the right to self-representation (*Faretta v. California*, 422 U.S. 806 (1975)).[2] Those two rights are mutually exclusive, and invocation of one is necessarily intertwined with waiver of the other. Just as had earlier been done with the right to counsel (*Gideon v. Wainwright*, 372 U.S. 335 (1963)), *Faretta* incorporated against the states a criminal defendant's right to self-representation via the Fourteenth Amendment's Due Process Clause. *Faretta*, 422 U.S. at 819-20 (footnote omitted), the only clearly established federal law (within the meaning of Section 2254(d)(1)) that is relevant to this habeas petition, confirmed that right in these straightforward terms:

> Although not stated in the Amendment in so many words, the right to self-representation--to make one's own defense personally--is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

Waiver of the right to counsel by an accused must be knowing, voluntary and intelligent (*Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938)). For any such waiver to be effective, the accused "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'" (*Faretta*, 422 U.S. at 835, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942).

For his part, Haviland contends that Moore's request to proceed pro se was unclear and equivocal, so that the trial judge was not required to engage in any further exploration of the matter. To the contrary, Moore twice expressly asked the judge whether he could "go pro se." Instead of responding directly or promptly launching the necessary *Faretta*-based inquiry, the judge responded by warning Moore that he had never seen a successful pro se defendant and by then asking Moore to draft a letter over the lunch break outlining his competence and trial strategy. Moore did so, but his attorney--with the court's permission--did not tender the letter to the court until the following morning.

---

[2] Nothing in last month's teaching by the Supreme Court as to the scope of the *Faretta*-stated right under wholly different circumstances (*Indiana v. Edwards*, 554 U.S. __, 128 S.Ct. 2379 (2008)) impacts on the decision here.

Moore's letter set out four alternative scenarios, the fourth of which was to proceed pro se.[3] With the trial judge having failed to grant any of Moore's first three alternatives, he was duty bound to treat the letter as a clear request to proceed pro se, written by the accused after the court had cautioned him against the soundness of that decision. Moore's request to proceed pro se was no less voluntary because it was contingent on the denial of other options that he might also find palatable (*Jones v. Jamrog*, 414 F.3d 585, 592-93 (6th Cir. 2005)). While the state appellate court did not explicitly hold that Moore asked unequivocally to proceed pro se, it did state "that he wished to proceed pro se" and "requested permission to proceed pro se in his letter to the court" (*State v. Moore*, No. 78751, 2002 WL 664104, at *4-*5 (Ohio App. Apr. 18, 2002)).

Although the trial judge expressed an initial concern as to the timeliness of Moore's request, he backed off that track and instead told Moore to write him a letter outlining his proposed self-representation. For the judge then to have waited to read the letter until Moore had already taken the witness stand, rather than addressing the issue promptly, gave Moore no choice but to proceed with counsel conducting direct examination. Then for the judge not to have engaged Moore in a *Faretta*-compliant colloquy upon reading the letter was an unreasonable application of *Faretta*. Moore had made not one but two clear requests to proceed pro se--the second in a letter written after cautionary statements by the court--and it was clearly contrary to *Faretta* for the court to have failed to address those requests promptly and fully.

Warden Haviland argues that Moore's requests were untimely and that a trial court has discretion over whether to grant a request to proceed pro se mid-trial. But Moore's requests were not rejected for untimeliness, either at trial or by the state appellate court. Although the state courts did not do so, our dissenting colleague would reject Moore's exercise of his *Faretta* right on untimeliness grounds. We have no quarrel of course with the notion that a defendant's invocation of the right of self-representation must be timely--but here it was not until the trial was well under way that Moore's grounds for dissatisfaction with counsel's representation arose--and he then acted swiftly. Moore can scarcely be faulted on some concept of tardiness under those circumstances. If he had not acted when he did--if he had waited for the trial to conclude and then sought post-conviction relief on the basis of constitutionally ineffective representation by his appointed counsel--we can be quite certain that he would have been met not only with arguments as to asserted substantive inadequacies of that contention but with the added argument that he should have raised that issue when it first arose at trial.

To return to the treatment at the trial court level of Moore's requests to represent himself, the trial court flat-out failed to exercise its discretion and ultimately did not rule on those requests, but let the issue go by default instead. Such failure to make a ruling on a criminal defendant's unequivocal request to proceed pro se was objectively unreasonable in light of *Faretta*.

Contrary to Haviland's assertions and to the state appellate court's analysis, *McKaskle v. Wiggins*, 465 U.S. 168 (1984) is not on point here. *McKaskle* addresses the constitutional boundaries of standby counsel's involvement in criminal proceedings against the wishes of a pro se defendant. Moore never became a pro se defendant, nor was his attorney standby counsel. Moore does not complain that his attorney overstepped his bounds as standby counsel--rather he complains that he was denied his right of self-representation. For the state appellate court to read *McKaskle* to find a waiver of Moore's right to self-representation was an objectively unreasonable application of that decision.

---

[3] Significantly, each of the other three alternatives involved substantial personal involvement in his defense by Moore himself. Thus the final request for outright pro se representation was not at all an introduction of a new concept, but rather carried forward the same unequivocal assertion that Moore had conveyed in the oral colloquy first quoted in this opinion.

Moore did take the stand and respond to questions from his attorney after his requests to proceed pro se. But by contrast with *McKaskle*, no presumption of acquiescence attaches to that representation by counsel, because Moore was never permitted to proceed pro se. Without having ruled on Moore's two requests for self-representation, the trial judge told Moore's attorney to call the next witness and Moore was called to testify. It would be wholly unreasonable to require Moore, in order to preserve his requests to proceed pro se, to refuse the trial court's orders to continue with the trial, especially in light of the court's having previously admonished him for disrupting the trial. Moore's responsiveness to questions posed by his attorney was neither a withdrawal of his previous requests to proceed pro se or a waiver of his right to self-representation.

## IV. Conclusion

Given the state courts' objectively unreasonable misapplication of the law as clearly established in *Faretta*, Moore's habeas petition must be granted. By failing to rule on Moore's unequivocal requests to proceed pro se, the trial court deprived him of his Sixth Amendment right to self-representation. Moore's conviction cannot stand in light of that structural error, which "is not amenable to 'harmless error' analysis" (*McKaskle*, 465 U.S. at 177 n.8). Accordingly the district court's issuance of a conditional writ of habeas corpus is **AFFIRMED**.

————————————

## DISSENT

————————————

ROGERS, Circuit Judge, dissenting. Where a criminal defendant waits until the final day of trial to invoke his right to self-representation, a trial judge does not unreasonably apply clearly established federal law in declining to grant that request. Therefore, I would reverse the order granting a conditional writ of habeas corpus here.

*Faretta v. California*, 422 U.S. 806 (1975), upon which Moore relies for relief, did not announce an unqualified right to self-representation. In holding that a defendant's rights were violated when he was not permitted to proceed *pro se*, the Supreme Court stressed not only that his request for self-representation was made "clearly and unequivocally," *id.* at 835, but that it was made far in advance of trial. The Court mentioned the timing of the defendant's request no fewer than three times, noting that the request was made "[w]ell before the date of trial," *id.* at 807, and "weeks before trial," *id.* at 835, and that a hearing on the motion was held "[s]everal weeks thereafter, but still prior to trial," *id.* at 808. The Court then concluded the opinion by holding that "[i]n forcing Faretta, *under these circumstances*, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right." *Id.* at 836 (emphasis added). Thus, although the Supreme Court did not explicitly impose a timeliness requirement, it "incorporated the facts of *Faretta* into its holding." *Marshall v. Taylor*, 395 F.3d 1058, 1061 (9th Cir. 2005); *see also United States v. Young*, 287 F.3d 1352, 1354 (11th Cir. 2002) ("The Court mentioned the timeliness of the request in both the opening paragraphs and the breadth with which the Court announced its decision.").

Accordingly, as the Supreme Court has recognized, "most courts" have interpreted *Faretta* to require that a defendant assert his right to self-representation "in a timely manner." *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 161-62 (2000); *see also, e.g., Wood v. Quarterman*, 491 F.3d 196, 201-02 (5th Cir. 2007); *United States v. Edelmann*, 458 F.3d 791, 808 (8th Cir. 2006); *United States v. Young*, 287 F.3d 1352, 1353-55 (11th Cir. 2002); *United States v. Martin*, 25 F.3d 293, 295-96 (6th Cir. 1994); *United States v. Brown*, 744 F.2d 905, 908 (2d Cir. 1984); *United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir. 1979). This view is consistent with the traditional rule that a defendant's right to represent himself "is sharply curtailed" once a trial begins. *See United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 15 (2d Cir. 1965). Under this rule, which *Faretta* did not purport to alter, the decision of whether to grant a motion to proceed *pro se* made after trial has begun is left to the "sound discretion of the trial court." *Lawrence*, 605 F.2d at 1324; *see also Robards v. Rees*, 789 F.2d 379, 384 (6th Cir. 1986).

This court, like most others, has consistently declined to find constitutional error in the denial of a request for self-representation made after the initiation of meaningful proceedings. In *Robards v. Rees*, 789 F.2d at 383-84, for example, this court held that the denial of a defendant's *pro se* request did not violate his rights where that request was made after the jury was sworn in and roll had been called. The grant of such an untimely request, this court held, "would have impermissibly delayed the commencement of the trial." *Id.* at 384. Although this court also noted that the defendant had not exhibited a genuine desire to represent himself, *id.* at 383-84, our subsequent decisions have made clear that tardiness alone is sufficient grounds for denying a motion for self-representation. In *United States v. Conteh*, 234 F. App'x 374, 381 (6th Cir. 2007), we held that it was not an abuse of discretion to deny a request made "after trial began," stating simply that "[t]he motion was untimely." *See also United States v. Pleasant*, 12 F. App'x 262, 266-67 (6th Cir. 2001) (motion was properly denied where made "on the day of trial with prospective jurors standing outside of the courtroom"); *Martin*, 25 F.3d at 295-96 (denial of motion made "after the trial was in full swing [was] *a fortiori* a proper exercise of discretion").

If it was constitutional to deny the right to self-representation in those cases, then surely the same was permissible here. Moore did not even express interest in proceeding *pro se* until the fourth day of a five-day trial, and did not make a request to do so that was even arguably clear until the fifth and final day of trial. Moreover, there is no doubt that granting Moore's request would have seriously derailed the proceedings. In his note to the trial judge, for example, Moore acknowledged that he would need to "review[] documents in [the] Prosecutor's control," "formulate a full [and] encompassing strategy," "formulate [questions] to be asked of [him] when [he took the] witness stand," and "write the closing argument." While one must suspect that a longer period would have been needed, even the two-day continuance that Moore requested to allow for the completion of these tasks would have caused a significant disruption. Though the state trial judge never made a formal ruling on Moore's motion for self-representation, his decision not to grant Moore's request was in effect a denial.

Timeliness, moreover, cannot be measured from when a defendant perceives the need to represent himself. *See Stenson v. Lambert*, 504 F.3d 873, 879, 884-85 (9th Cir. 2007). Supreme Court precedent does not provide defendants with a right to demand self-representation based on "dissatisfaction with counsel's representation" arising during the trial. *See* Maj. Op. at 10. Recognition of such a right would effectively do away with any meaningful timeliness requirement. Habeas relief accordingly cannot be granted on this ground.

And, because the state trial judge could have simply denied Moore's motion as untimely, it is not an objectively unreasonable application of clearly established federal law to conclude that a *Faretta* hearing was not necessary. Just as nothing in *Faretta* requires a court to grant a motion for self-representation made after meaningful proceedings commence, nothing in that decision, or any other Supreme Court case, mandates that a hearing be held on such an untimely request. Thus, although it may have been preferable for the state trial judge to have engaged in a *Faretta* inquiry and to have ruled formally on Moore's motion, his failure to have done so does not warrant issuance of the writ.

That the state court of appeals did not base its decision on the untimeliness of Moore's request does not prevent reliance on that ground now. Here, as the magistrate Report and Recommendation adopted by the district court acknowledges, the state court of appeals "did not analyze whether the trial court properly handled Moore's request to represent himself under the clearly established federal law announced in *Faretta*." That court never, for example, inquired into whether Moore's alleged *pro se* requests were unequivocal or vague, as *Faretta* clearly requires. Moreover, the state court of appeals appears to have examined Moore's claims under state cases instructing judges how to respond to trial complaints of ineffective assistance of counsel.

In a situation such as this, where the most recent state adjudication "does not squarely address the federal constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis," *Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006), a habeas court must conduct an independent inquiry of the record and applicable law, and may reverse only if the state court result was contrary to or an unreasonable application of federal law, *Maldonado v. Wilson*, 416 F.3d 470, 475-76 (6th Cir. 2005). This modified form of AEDPA deference allows, and indeed requires, a federal court to deny habeas relief on any rationale that the record will support, even one that was not directly relied upon.