**Harry Leroy JOHNSON aka Charles Leroy Mitchell, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 63794.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 19, 1984.

Thomas D. White, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Michael D. Olsen, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

TEAGUE, Judge.

Harry Leroy Johnson, aka Charles Leroy Mitchell, appellant, was convicted by a jury of theft over $200 but less than $10,000. The jury also assessed his punishment, enhanced, at fifteen (15) years' confinement in the penitentiary and a fine of $1,000.

We will reverse appellant's conviction because the trial court denied appellant his constitutional right of self-representation.

Notwithstanding that we will reverse appellant's conviction because the trial court denied him his constitutional right of self-representation, but because he raises a challenge to the sufficiency of the evidence on the question of the value of the watch and rings that he and his confederate unlawfully appropriated from the complainant, we will first discuss appellant's first ground of error, namely: "There is no evidence in the record as to the fair market value of the rings or the watch." See *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

The facts show that appellant, acting with another person, convinced the complainant and her companion to become unknowing participants in the age-old confidence game of "pigeon dropping," [1] during which they fraudulently relieved the complainant of her watch and two rings.

The complainant testified that she bought the watch and one of the rings for $143 and $414, respectively, at retail stores in Houston approximately four months prior to the day in question. The other ring taken was a gift.

In addition to charging the jury on the value as alleged, over $200 and under $10,000, the trial court also instructed the jury

---

1. The term "Pigeon Dropping" has been defined to mean the following: "An old and commonly used confidence game where two con-men work together to defraud a victim of money or property ... There are many variations of the game." Martin, *Law Enforcement Vocabulary* at 172.

that "If you find that the value of the property taken was less than two hundred dollars, you will find the defendant guilty of the lesser offense of misdemeanor theft."

It is now axiomatic that the owner of property unlawfully taken from him may testify as to the value of the property even though he is not qualified to testify as an expert as to what the fair market value of the property might be. *Davila v. State,* 547 S.W.2d 606 (Tex.Cr.App.1977).

In this instance, the complainant testified to the retail prices that she paid for the watch and one of the rings, which totaled more than $200. Although the complainant never stated that in her opinion the fair market values of the watch and ring were $143 and $414, respectively, nevertheless, her testimony was obviously meant to convey that idea to the jury. The record in this instance also reflects that the complainant testified that she did not consider the watch and ring "second-hand property." We find that, in light of its verdict, the jury must have so understood her testimony for it was given the choice of either finding appellant guilty of the greater offense of felony theft or guilty of the lesser offense of misdemeanor theft or not guilty and it opted to find appellant guilty of the greater offense.

We believe that where the owner of property testifies that a short time before the wrongful appropriation occurred he paid a certain sum of money in United States currency for the property, this is sufficient to make a prima facie case of the fair market value of the item unlawfully taken. In this instance, the appellant never took issue with the complainant's testimony as to what she paid for the watch and the ring. Thus, the State made a prima facie case as to the fair market values of the watch and the ring.

We hold that the evidence is sufficient to sustain the jury verdict that the complainant's property that was appropriated by appellant and his confederate had a value over $200. Appellant's first ground of error is overruled. Also see *Nitcholas v. State,* 524 S.W.2d 689 (Tex.Cr.App.1975); *Trammell v. State,* 511 S.W.2d 951 (Tex. Cr.App.1974); *Turner v. State,* 486 S.W.2d 797 (Tex.Cr.App.1972); *Price v. State,* 493 S.W.2d 528 (Tex.Cr.App.1973); *Thomas v. State,* 85 Tex.Cr.R. 246, 211 S.W. 453 (1919).

We will next consider appellant's contention that he raises in his fourth ground of error, namely, "The Court committed reversible error when he refused to let Appellant defend himself." We will sustain his contention.

It is now axiomatic that an accused person has the constitutional right to defend himself, *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and if he timely and properly invokes this right, reversible error will result if the trial judge refuses his demand for self-representation.

The record reflects that some time before appellant's case was called for trial, appellant and his retained attorney, C.C. Devine, a former Houston attorney who is now deceased, were having difficulties because Devine had filed a motion for continuance in appellant's cause when the cause was set for trial. Devine asserted orally and in the motion that he needed the continuance because he had a conflict in trial settings and was unable to get out of a trial setting he had in Ballinger on another case. Appellant apparently thought that Devine had filed the motion for continuance on the basis that the other case was more important than his case. Devine's motion for continuance was not granted by the trial court, but the case was continued from day to day until Devine returned to Houston from Ballinger.

After Devine returned from Ballinger and appeared in the trial court, he announced to the trial judge, who is also now deceased, that he was "not ready" for trial, asserting that appellant had previously dismissed him as counsel. He also told the trial judge that he did not wish to further represent appellant because "[w]e cannot

be compatible in each other's presence." Appellant also told the trial judge that he did not want Devine representing him, wanted to dismiss Devine as his attorney, and wanted additional time in which to employ another attorney. Devine's motion to withdraw from the case and appellant's motion to dismiss Devine from the case were both denied by the trial judge. A jury panel was summoned from which the jury that would hear appellant's case would be selected.

After the prosecuting attorney voir dired the jury panel, Devine then voir dired the jury panel, during which appellant personally made it known to the jury panel that he believed he was being denied his right to have the assistance of counsel of his choice. Thereafter, a venireperson made it known to counsel and the trial judge that she was concerned about what appellant had stated. Notwithstanding that the trial judge informed the venireperson that the issue of Devine representing appellant was none of her concern, the venireperson continued to express her concern to the judge about the matter. In so many words, the trial judge told the venireperson "to go and sit down." Appellant's statement about being deprived of counsel of his choice also concerned the prosecuting attorney because he motioned the trial judge to quash the jury panel. The trial judge denied the motion. A jury was thereafter selected and court recessed until the next morning.

Almost immediately after court resumed business the next morning, but before appellant had entered his plea to the indictment, things began to go downhill for the trial judge. Appellant commenced to speak to the judge, after which the jury was retired. Appellant then expressed to the trial judge his desire that he be allowed to represent himself. The prosecuting attorney immediately moved to quash the jury. Devine interjected: "This Defendant is exercising his rights. He has got a right to defend himself ..." Thereafter, appellant stated the following to the trial judge—at least three times: "I would like to defend myself." The trial judge instructed appellant he would have to speak through De-

vine, "because I do not have to answer you. Sit down." Devine interjected on one occasion the following when the trial judge and appellant were speaking to one another: "Let the record reflect that he takes exception to the Court's ruling." Appellant continued to express to the trial judge his desire to defend himself, but did so through Devine. The record reflects the following: "THE DEFENDANT: [Speaking to Devine] Ask him [referring to the trial judge] if he [the trial judge] is saying I can't defend myself. THE COURT; That's what I said. MR. DEVINE: [Apparently referring to appellant] That's what he said." The record also reflects that after the above, the following occurred: "THE DEFENDANT: Can I defend myself? THE COURT: You can't."

Contrary to the day before when appellant made known that he wanted Devine dismissed as his counsel, and that he be given additional time to employ other counsel, on the day that appellant made the demand that he be allowed to represent himself, he did not demand any such delay. "He merely asserted his constitutional right to represent himself at trial." *Blankenship v. State*, 673 S.W.2d 578 (Tex. Cr.App.1984).

We find that the crucial question we must answer is whether appellant's demand for self-representation was timely made. Under the circumstances of this case, we hold that it was.

■ As to the right of self-representation, we need not repeat what the Supreme Court stated in *Faretta v. California*, supra, or what this Court recently stated in *Blankenship v. State*, supra. It is sufficient for our purposes to state that an accused person has a constitutional right to represent himself pro se. However, like any constitutional right, such can be waived.

■ In this instance, the appellant's demand for self-representation was made after the jury had been empaneled. Cf. *Blankenship v. State*, supra, where the

demand was made before the jury was empaneled and this Court held such demand was timely. However, the record is clear that appellant's demand occurred prior to the reading of the indictment and before the presentation of any evidence by the State. Furthermore, there is not anything in this record that would reflect that had the trial judge honored appellant's demand for self-representation at that point in time, this would have caused such a disruption of the proceedings as to have affected the administration of justice. E.g., *Stepp v. Estelle*, 524 F.2d 447 (5th Cir.1975), in which the Fifth Circuit Court of Appeals approved the trial judge's decision to allow a defendant to proceed pro se even though the defendant first asserted that right during the prosecutor's voir dire examination of a potential juror. In *Chapman v. United States*, 553 F.2d 886 (5th Cir.1977), the Fifth Circuit Court of Appeals, referring to *Stepp*, stated the following: "... there is language in our opinion [of Stepp] suggesting that even at this late stage in the proceedings [during the voir dire examination] the defendant was entitled to his full rights under Faretta." (894).

We hold that although appellant's demand was made after the jury was selected, his demand was timely urged. The trial judge, after complying with what we stated in *Blankenship v. State*, supra, and other cases, regarding making an accused aware of the dangers and disadvantages of self-representation, should have given appellant the opportunity to represent himself pro se.

The judgment of the trial court is reversed and the cause remanded to the trial court.