# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 5, 2015

Plaintiff-Appellee,

v

No. 318294
Van Buren Circuit Court

ANTONIO LEWIS,

LC No. 12-018553-FC

Defendant-Appellant.

Before: BECKERING, P.J., and BORRELLO and GLEICHER, JJ.

PER CURIAM.

The prosecution charged that defendant Antonio Lewis murdered his half-brother, Ivory Shaver. On the second day of trial, defendant moved to represent himself. During a lengthy colloquy, the trial court explored defendant's legal acumen and the reasons for his request. Defendant expressed that he knew more about the case than his appointed counsel and "could just cut to the chase and get it out there." He did not seek an adjournment or any delay of the trial. The court denied defendant's motion, finding it unequivocal but not knowing or intelligent due to defendant's "abundant lack of awareness of the rudimentary rules that govern trials." Further, the court ruled, defendant's self-representation would unduly burden, inconvenience, and disrupt the court's business. The jury subsequently convicted defendant of second-degree murder, MCL 750.317.

Defendant raises several issues on appeal. All lack merit but for defendant's contention that the trial court improperly denied his self-representation request. Because the record is devoid of evidence supporting—or even suggesting—that defendant's request would have disrupted, unduly inconvenienced or burdened the administration of the court's business, we are constrained to vacate defendant's conviction and remand for a new trial.

## I. UNDERLYING FACTS AND PROCEEDINGS

Ivory Shaver disappeared on November 18, 2011. His body was found in a drainage ditch approximately four months later. No cause of death could be identified. Nevertheless, the police suspected that defendant killed Shaver in revenge for Shaver's cooperation in a Child Protective Services (CPS) investigation aimed at defendant, and Shaver's subsequent failure to bail defendant out of jail on a child support charge.

-1-

The evidence amassed against defendant was entirely circumstantial, but decidedly powerful. Defendant was released from jail on the same day that Shaver went missing. By his own admission, defendant was the last person to see Shaver alive. While Shaver's whereabouts remained unknown, defendant secreted Shaver's cell phone and used it to send text messages, ostensibly written by Shaver, to Shaver's girlfriend and family members. Several of the messages purported to explain Shaver's absence. On the day Shaver disappeared, defendant exchanged a car—owned by Shaver's girlfriend—for money defendant's former cellmate used to post defendant's bail. Defendant later claimed that he had seen Shaver drive away in the vehicle. Defendant was familiar with the remote area where Shaver's body was found, and during a fight with his girlfriend, threatened that "he'd kill [her] too."

In November 2012, defendant was bound over to the circuit court on a charge of open murder. The court scheduled a jury trial for March 5, 2013. On February 27, 2013, defendant's appointed counsel, Nicole Dunfield, moved that defendant undergo a forensic examination. Ms. Dunfield advised the court that defendant had "a prior mental health record" and "has done some time in a mental health facility." Counsel explained that although defendant "can write, he can speak, he can articulate himself," he lacked focus "on task on what questions are being presented to him, on what answers are being given back to counsel." As trial approached, Dunfield continued, defendant "slid back from being able to help communicate with me[.]" The trial court ordered a competency evaluation and adjourned defendant's trial.

The forensic examiner found defendant competent to stand trial. In relevant part the examiner noted:

> Although he verbalized a desire to proceed in a particular manner in his case, his responses did not indicate overly rigid thinking. He expressed willingness to work with his attorney to plan his defense. He expressed rational concerns regarding his case. He demonstrated the ability to learn and retain information presented to him. He exhibited adequate memory as evidenced by his ability to provide an account of his behaviors leading to the alleged illegal conduct and relevant details from his history without difficulty. He was able to identify potential evidence in his case. He evidenced adequate attention and concentration over the span of this interview, suggesting that he would be able to track court proceedings. He demonstrated the capacity to regulate his emotions and maintain appropriate behavioral control during this evaluation. He expressed an understanding of potential consequences of behaving inappropriately in the courtroom.

> [Defendant] demonstrated the capacity to communicate effectively. He comprehended questions posed and provided relevant, detailed, and organized responses. He spontaneously clarified information presented during this examination and was forthright with relevant information. He asked relevant clarifying questions, suggesting that he would feel comfortable asking his attorney for additional assistance, as necessary. Behavioral observations suggested that [defendant] would feel comfortable expressing concerns to his attorney and advocating for himself. He did not present as overly suggestionable.

The trial court declared defendant competent and rescheduled the jury trial for July 9, 2013.

At a pretrial conference conducted on July 5, 2013, Dunfield requested an opportunity to question defendant on the record. Dunfield elicited defendant's agreement that the two had "many meetings leading up to preparing for this trial," discussed witnesses and together drafted a witness list, and that all defendant's questions and requests had been answered or fulfilled. The court asked defendant if there were "any issues that you feel need to be addressed before we proceed to trial[,]" and defendant answered: "None at all. Actually, no."

A jury was selected and sworn on July 9, 2013. The next morning, Dunfield advised the court that defendant wished to represent himself. The court asked defendant whether he had ever represented himself in a criminal matter. Defendant responded that he had represented himself in a "false domestic," which he defined as "having a spouse that was ticked off with me," and in a case involving threats to "some CPS workers." The former, defendant conceded, was a misdemeanor. The trial court inquired as follows:

> *The Court*: Okay. Do you know what the difference is between a misdemeanor and felony?
>
> *A*. Oh, yeah.
>
> *Q*. What are the differences?
>
> *A*. The difference is with a misdemeanor you do time in jail, you may do probation, you can get a fine, um, which includes and/or. With a felony you can do time in prison. There is some felonies you don't do time in prison. You can get fines, cost, probation, parole, depends on what your situation is.
>
> *Q*. Okay.
>
> And what is the maximum penalty for this offense?
>
> *A*. This one here taking it to trial, if I lose, I could spend the rest of my life in prison.

Defendant provided additional details regarding the CPS case he defended and volunteered: "I won one; lost one."

The trial court then embarked on a lengthy examination of defendant's legal knowledge:

> *Q*. Have you - - what's your highest level of education?
>
> *A*. I went to college, computer-aided drafter, drafting. Um, did a couple years law enforcement as a DNR officer. That's pretty much it. I did a lot of - -
>
> *Q*. What legal training do you have, sir?
>
> *A*. None, just the DNR.

-3-

*Q*. DNR?

*A*. Yes, the Department of Natural Resources.

*Q*. Department of Natural Resources?

*A*. Yes.

*Q*. Okay. So you have no law degree obviously?

*A*. Right.

*Q*. And you have no legal training?

*A*. Right.

*Q*. Okay.

What are - - what's MRE?

*A*. Michigan recovery of evidence.

*Q*. Those would be the Michigan Rules of Evidence.

*A*. Well, Rules of Evidence. Sorry.

*Q*. What's MCR?

*A*. Michigan Compiled Rules I believe it is.

*Q*. What's the hearsay rule, sir?

*A*. It's - - I can't really remember too much of that.

*Q*. Okay. What's the definition of hearsay under the law?

*A*. If a person comes in and says that they heard this and it come out the mouth of another person and this person is not the one who's testifying to what was said and it came out the mouth of another person.

*Q*. Okay.

*A*. While on the stand.

*Q*. Does it have to be offered for a specific purpose in order for it to be hearsay?

*A*. What was that you said?

-4-

*Q.* Is it your belief that all - - every time a person gets on the stand and wants to tell what another person said to them, that that would be hearsay?

*A.* Not always.

*Q.* Okay.

*A.* It - -

*Q.* Do you know what the legal definition is of hearsay?

*A.* I can't remember right offhand.

*Q.* Okay.

Do you know - - can you give me some of the exceptions under the Michigan Rules of Evidence of the hearsay rules?

*A.* I can't remember that one.

*Q.* Okay.

If the Prosecutor, for example, in this case were to call an expert pathologist to the stand, what might you do to challenge that expert's credibility or credentials and under what Rule of Evidence would you proceed?

*A.* I'm not really for sure. Sometimes I go off of what I hear, what I've read. Um, I do go off of evidence. Uh, like I said, it's just - - you know, I play everything by ear and - -

*Q.* Pardon?

*A.* I said I usually play everything by ear.

*Q.* Okay.

Are you aware of say Rule of Evidence 901, what that is?

*A.* No.

*Q.* Okay.

What's the definition of relevant evidence under the Rulings of Evidence?

*A.* What the relevancy like, um, say we're talking about this phone in this case, you know, and they bring up some other phone that has nothing to do with it, that, you know, would go to relevance, you know, of why that phone was brought up.

-5-

*Q.* Do you know the definition of relevant evidence under the Rules of Evidence, sir?

*A.* I can't say that I do.

*Q.* Okay.

Do you know what lesser included offenses - -

*A.* Yes.

*Q.* - - are? What would be lesser included offenses in this case?

*A.* Um, like with this one we're looking at, all right, because I'm taking it to court - - trial rather, you know, I'm facing first degree. The jury I guess you could say would come back if they feel that it wasn't first degree and it could be dropped down to second degree.

*Q.* What's a cognate offense?

*A.* A who?

*Q.* A cognate offense.

*A.* I'm not for sure.

*Q.* Okay.

Can you list for me one exception to the hearsay rules under the Rules of Evidence?

*A.* What do you mean by that?

*Q.* Can you list for me or provide to me one exception under the Rules of Evidence to the hearsay rule? What's an exception? In what case would hearsay be allowed in court?

*A.* Mm-hmm. The only way is if that person that was supposedly or allegedly said this was to take the stand and back up what the other person said.

*Q.* Okay.

There are a series of exceptions to the hearsay rule - -

*A.* Right.

*Q.* - - under the Rules of Evidence and it's very important that the person representing themselves or a lawyer know the Rules of Evidence in and out in a court proceeding and that's why I'm asking you - -

*A.* Right.

*Q.* - - to establish your knowledge to these matters.

*A.* Right.

*Q.* Okay. And of the law.

Someone may have an interest in controlling their defense, but yet, through no fault of their own have very little or no knowledge of the law that will apply and that controls the entire proceedings.

*A.* Right.

*Q.* And what evidence is admissible and what evidence is inadmissible and what objections to make.

*A.* Mm-hmm.

*Q.* So that's why I'm questioning you about those.

*A.* Right. I understand.

The trial court requested that defendant explain why he wanted to represent himself, given "some of these rules . . . that it appears you're not familiar with." Defendant responded:

*A.* I thoroughly went through a lot of my paperwork from the time I come in and received paperwork. Um, there's a lot of stuff I received. Unfortunately, I also have a lot of stuff that disappeared. I have a very good memory. There's things that should have been out there that wasn't presented, um, with this whole matter. I said it's the fact that I would have to spend a lot of time explaining a lot of this to my attorney which would, you know, take pretty much a little bit too much time and I said it just - - from all just - - you know, ever since this started from the time I found out, you know, my brother had passed, there's a lot of things that I looked into that kind of goes with this case in a matter of what the detectives may have and what they may not have. I understand the questions that they asked and did not ask, stuff that was presented that they should have presented that was not presented. It's - - like I said, it's a whole truckload of stuff that they don't see that I see and that she doesn't see and that I'd have to explain to her and help her to understand. Like I said, there's stuff that's there that helps me out. There's stuff that's missing that helps me out and, like I said, it just - - I don't really want to like have anybody up there for a long period of time. I could just cut to the chase and get it out there.

*Q.* Okay.

Any other reasons why you wish to represent yourself, sir?

*A.* No, no. Um, as to my attorney, she's, you know, she's perfectly good. You know, I mean, she's - - she's been there with me through the whole thing, you know. Of course, you know, we've probably had some disagreements about certain things but other than that, you know, I trust her. You know, I would refer her to, you know, other people or whatever, but it's just - - you know, there's certain things that I understand and know that it would be, you know, too much time for me to have to try and explain to her when I'd rather persist, you know, to get it out there that, you know, as what my knowledge that I have of what I knew that - - know that's true facts and stuff and I could back it up.

*Q.* Okay. Your issue is getting out there knowledge of some facts?

*A.* Right.

*Q.* Okay.

Can you relates [sic] those facts to your attorney, sir?

*A.* Like I said, a lot of it would take a whole lot of time, I mean, way too much, you know, and - -

*Q.* And you have not been preparing heretofore prior to today to represent yourself, correct?

*A.* Right.

*Q.* Okay. Your attorney has been doing all of the legal work and has been reviewing all of the documents that may or may not be admitted - -

*A.* Right.

*Q.* - - on your behalf up until now, correct?

*A.* Right.

*Q.* Okay. Thank you.

The trial court then denied defendant's self-representation motion:

The standard for the Court's consideration today is that the Defendant's request for self-representation was unequivocal. He does appear to be unequivocal in his request made today.

The Court must also find, however, that the Defendant's request is made knowingly, intelligently, and voluntarily. As it relates to that prong, the Court finds that the Defendant's request is not knowingly or intelligently made. He displayed before the court, through no fault of his own because he is not an attorney, a naivete and abundant lack of awareness of the rudimentary rules that

-8-

govern trials, whether it be a murder trial or a misdemeanor trial. He's not familiar with the Rules of Evidence. He lacks knowledge of the Court Rules. He does not know how to cross-examine an expert witness. He cannot list even one exception to the rules of hearsay, so although he has the desire to represent himself, the Court finds that it's not an intelligent and voluntary request.

The third issue for the Court today is that the Court - - the Court must find that the court would not be unduly burdened, inconvenienced, or disrupted if Defendant's request was granted. This Court finds that the court would be unduly burdened and inconvenienced and disrupted. By Defendant's own words, he has not been proceeding as an attorney. He has not been reviewing documents as an attorney. His attorney has been taking care of all of those matters for him. In order to have him adequately prepared for his own defense, the Court would have to stop this proceeding and give him time to view everything through the lens of a lawyer, not through the lens of a defendant assisting his lawyer in his own defense.

So because of that, the Court will deny Defendant's request made today on the second day of trial.

The prosecutor and Dunfield gave opening statements, and several witnesses testified. Following an afternoon recess, the court readdressed its self-representation ruling as follows:

The Court wanted to just put some further explanation on the record of the ruling denying the Defendant's request at this late date on the second day of trial to represent himself.

The Court's finding in this regard is based on the fact that Defendant acting as his own counsel at this time the Court find would disrupt and unduly inconvenience and burden the court and the administration of the court's business. There would be suddenly on day two of trial after jury selection a different theory of the trial, a different manner of proceeding. Defendant's lack of legal knowledge, while it may not go to his knowing nature and intelligent waiver and voluntary waiver, it certainly goes to the Court - - the anticipation of the Court when the Court considers how long the trial would take, how many disruptions there would be in the trial. The Court has obviously blocked out a certain amount of time for this trial well in advance. This case, again, as indicated earlier, has been in Circuit Court alone since November and to change course now with Defendant indicating he would want to pursue a different strategy, the Court finds would disrupt and inconvenience the court and the administration of the court's business.

On the seventh day of trial, the jury found defendant guilty of second-degree murder. The trial court sentenced him to 39 to 80 years' imprisonment.

## II. ANALYSIS

### A. SELF-REPRESENTATION

Defendant first challenges the trial court's denial of his request for self-representation. The Sixth Amendment to the United States Constitution, the Michigan Constitution, and a statute afforded defendant a right to represent himself at his trial. In *Faretta v California*, 422 US 806, 814; 95 S Ct 2525; 45 L Ed 2d 562 (1975), the United States Supreme Court explained that the Sixth Amendment implicitly embodies the right of self-representation in criminal proceedings.

> The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. . . . Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense. [*Id.* at 820-821 (emphasis in original).]

In contrast, the Michigan Constitution explicitly protects a defendant's right to self-representation: "A suitor in any court of this state has the right to prosecute or defend his suit, either in his own proper person or by an attorney." Const 1963, art 1, § 13. Our Legislature reinforced this constitutional right by enacting MCL 763.1:

> On the trial of every indictment or other criminal accusation, the party accused shall be allowed to be heard by counsel and may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and meet the witnesses who are produced against him face to face.

Because an invocation of self-representation implicates an equally fundamental right—the right to counsel—a court must "indulge every reasonable presumption against waiver" of the right to counsel, and should not allow a defendant to proceed pro se if any doubt casts a shadow on the waiver's validity. *People v Williams*, 470 Mich 634, 641-642; 683 NW2d 597 (2004) (quotation marks and citations omitted); *People v Adkins (After Remand)*, 452 Mich 702, 721, 727; 551 NW2d 108 (1996), criticized on other grounds in *Williams*, 470 Mich at 641 n 7. To assist trial courts in balancing the two constitutional rights, the Michigan Court Rules set forth specific guidelines for an effective waiver-of-counsel colloquy. MCR 6.005(D). The required inquiry consists of an examination, on the record, of whether the defendant understands the charge, the maximum sentence, the risks involved in self-representation, and his right to appointed counsel. A court must further determine that: (1) the defendant's request is unequivocal; (2) the right to self-representation has been asserted "knowingly, intelligently and voluntarily"; and (3) self-representation "will not disrupt, unduly inconvenience [or] burden the court." *People v Anderson*, 398 Mich 361, 367-368; 247 NW2d 857 (1976).

Here, the trial court specifically found that defendant's request was unequivocal, and the prosecutor has not challenged that finding. We turn our attention to whether defendant asserted the right to represent himself knowingly, intelligently and voluntarily.

An appropriate waiver colloquy carefully explores a defendant's knowledge of the crime with which he stands charged, the potential penalties, and the availability of counsel. MCR 6.005(D). At the outset of its dialogue with defendant, the trial court appropriately focused on whether defendant understood the seriousness of the open murder charge he faced and that he might spend the rest of his life in prison. Defendant's clear and direct answers established that he did. Defendant additionally acknowledged the presence of counsel throughout the proceedings. He offered that he had represented himself twice previously, once with success, thereby substantiating that he understood the perils of waiving an attorney's assistance. As in *Faretta*, 422 US at 835, "[t]he record affirmatively shows that [defendant] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." Defendant's answers to the courts questions further confirm that he was "aware of the dangers and disadvantages of self-representation," and made his choice "with eyes open." *Id.* (quotation marks and citation omitted).

Having expeditiously established the prerequisites for a knowing and intelligent waiver of counsel, the trial court changed course, piloting the discussion into forbidden territory. The court gave defendant a protracted quiz on the rules of evidence and other legal concepts. Defendant managed to answer some questions fairly accurately, but flubbed many others. The trial court concluded that defendant had failed the exam, ruling that his decision to represent himself was not "knowingly and intelligently made."

Perhaps the trial court believed that closely questioning a defendant concerning legal principles might indirectly warn him of "the dangers and disadvantages of self-representation." *Id.* However, the Supreme Court declared in *Faretta* that a trial court's concern with a defendant's legal acumen is misplaced:

> We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire*. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself. [*Id.* at 836.]

The Michigan Supreme Court echoed this sentiment in *Anderson*, 398 Mich at 368, explaining that a defendant's competence to waive counsel "does not refer to legal skills[.]" Defendant's lack of legal expertise simply did not justify denying him the right of self-representation.

Our Supreme Court has made it abundantly clear that we are to review for clear error a trial court's factual findings regarding a defendant's knowing and intelligent waiver of counsel. *Williams*, 470 Mich at 640. "[T]he meaning of 'knowing and intelligent' is a question of law. We review questions of law de novo." *Id.* (quotation marks and citation omitted). Considered under these standards, the trial court clearly erred by finding that defendant had not knowingly and intelligently elected to advocate for himself. Defendant's score on the quiz should not have played any role in the court's decision.

We now confront the trial court's second ground for denying defendant's self-representation motion: that it would "disrupt, unduly inconvenience [or] burden the court."

-11-

Manifestly, the *timing* of defendant's motion lies at the heart of the trial court's ruling. However, neither *Faretta* nor the pertinent opinions of our Supreme Court have established a bright-line rule governing the point at which a defendant must invoke or lose his self-representation right.[1]  Indeed, our Supreme Court has emphatically signaled its unwillingness to do so:

> The people would have us announce a guideline which would preclude the assertion of the right to proceed without counsel if it is not made before the trial begins.  We cannot accede to this request.  Although the potential for delay and inconvenience to the court may be greater if the request is made during trial, that will not invariably be the case.  [*Anderson*, 398 Mich at 368.][2]

We find this sentiment particularly pertinent because at the outset of the same paragraph, the Supreme Court first announced our state's rule that self-representation may be denied if a trial court determines that it will "disrupt, unduly inconvenience and burden the court and the administration of the court's business." *Id.*

*Anderson* is not the only case in which our Supreme Court has addressed the timeliness issue.  In *People v Wakeford*, 418 Mich 95, 102-103; 341 NW2d 68 (1983), the defendant fired his counsel on the fourth day of an armed robbery trial, thereafter calling his own witnesses, conducting his own cross-examinations, and giving his own closing argument.  On appeal, the defendant alleged that the trial court's allowance of self-representation denied him the right to counsel.  The Supreme Court disagreed, stating in relevant part: "The defendant had an absolute right to represent himself.  We find that the defendant voluntarily exercised that right, waiving his right to appointed counsel at trial." *Id*. at 121, citing *Faretta*, 422 US 806; *Anderson*, 398 Mich 361.

The Supreme Court revisited this language in *People v Dennany*, 445 Mich 412, 433-433 n 12; 519 NW2d 128 (1994), explaining in a footnote that it "must be regarded as dicta[.]"  Nevertheless, the lead opinion in *Dennany* affirmed that "the *Anderson* Court contemplated, but

---

[1] In *Martinez v Court of Appeal of California*, 528 US 152, 161-162; 120 S Ct 684; 145 L Ed 2d 597 (2000), the United States Supreme Court observed that "most courts require" a defendant to "elect to conduct his own defense . . . in a timely manner."  The Supreme Court continued: "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id*. at 162.  The Supreme Court provided no further guidance as to the meaning of "timely" in this context.

[2] MCR 6.005(E), promulgated after *Anderson* was decided, contemplates that if a defendant has waived counsel, he must be advised at each subsequent proceeding, including trial, "of the continuing right to a lawyer's assistance[.]"  However, "[t]he court may refuse to adjourn a proceeding to appoint counsel or allow a defendant to retain counsel if an adjournment would significantly prejudice the prosecution, and the defendant has not been reasonably diligent in seeking counsel."  MCR 6.005(E)(3).  The rule makes no mention of whether a defendant must elect self-representation by a certain point in the proceedings.

rejected, limiting the right to proceed pro se to only pretrial requests." *Id.* Accordingly, we conclude that defendant's constitutional right to elect self-representation remained in force during the second day of this trial.

Although the clearly erroneous standard of review applies to the trial court's determination of whether a waiver of counsel qualifies as intelligent and knowing, less clear is the standard of review applicable to the trial court's determination that self-representation would be inconvenient or burdensome. Our review of federal and state caselaw suggests a trial court possesses discretionary authority to deny a midtrial self-representation request based on practical considerations that bear less relevance when an earlier request is made.

In *United States v Betancourt-Arretuche*, 933 F2d 89 (CA 1, 1991), the United States Court of Appeals for the First Circuit reviewed the caselaw in that and other federal circuits addressing the timeliness of a defendant's self-representation request. A motion made on the first day of trial, the Court reaffirmed, is untimely in the First Circuit. "In general," the Court summarized, "a *Faretta* request is timely only if it is asserted before the jury is empaneled." *Id.* at 96 (quotation marks and citation omitted). As occurred here, the defendant in *Betancourt-Arretuche* voiced his request after the jury had been selected and sworn, and immediately before opening statements. *Id.* at 91. Unlike this case, Betancourt's request was equivocal, as he envisioned that his attorney "would continue representing me." *Id.* at 93. This was not a ground for automatically rejecting self-representation, the First Circuit explained, because "Betancourt had a constitutional right to proceed pro se; he could also utilize some sort of hybrid representation if it were approved by the court." *Id.* at 95. Nevertheless, the First Circuit upheld the trial court's denial of self-representation, holding:

> Betancourt had ample time and knowledge of the circumstances to make a request to represent himself at some earlier point. Having had an opportunity to weigh all the pro se factors in a more leisurely manner than did the district court, we affirm its decision on the grounds that the request for pro se representation was made too late. [*Id.* at 96.][3]

In a subsequent case, the First Circuit elaborated that the holding in *Betancourt-Arretuche*

> has come to mean that, although a criminal defendant's right to serve as his own attorney is absolute if invoked clearly and distinctly prior to the beginning of his trial, the right of self-representation becomes qualified once trial is under way. At that point, the presiding judge, in his discretion, may deny a defendant's request to act as his own lawyer. [*United States v Noah*, 130 F3d 490, 497 (CA 1, 1997) (citations omitted).]

In *United States v Singleton*, 107 F3d 1091, 1096 (CA 4, 1997), the Court of Appeals for the Fourth Circuit portrayed the timing issue as involving waiver: "if a defendant proceeds to

---

[3] Given the above-cited language in *Anderson*, this aspect of the First Circuit's opinion is inapplicable in Michigan.

trial with counsel and asserts his right to self-representation only after trial has begun, that right may have been waived, and its exercise may be denied, limited, or conditioned." Like the First Circuit, the Fourth consigns to the trial court's "sound discretion" whether to allow self-representation when a defendant first invokes the right after trial has begun. *Id.*

The Sixth Circuit, too, reviews the denial of midtrial self-representation motions under an abuse of discretion standard. See *United States v Martin*, 25 F3d 293, 296 (CA 6, 1994). But in *Moore v Haviland* 531 F3d 393 (CA 6, 2008), the Sixth Circuit cautioned that at times, a defendant's grounds for invoking self-representation legitimately may not arise until midtrial. In *Moore*, the defendant moved to proceed pro se on the third day of his trial after informing the trial court that he was "displeased with some aspects of his representation[.]" *Id*. at 395. His first request to speak to the judge was rebuffed. During two subsequent conversations, the defendant reiterated his desire to proceed pro se. *Id.* at395-400. The trial court denied the request. The Sixth Circuit observed that the trial court failed to engage the defendant "in a *Faretta*-compliant colloquy" at the time the defendant first raised the issue. *Id*. at 403. When the trial court finally ruled, it did not reject self-representation based on untimeliness, but rather "flat-out failed to exercise its discretion and ultimately did not rule on [the] requests, but let the issue go by default instead." *Id*. The defendant's conviction was reversed and a new trial ordered.

Other appellate courts have pointed out that a trial court's discretion to deny an untimely self-representation motion is not unbridled. In *Johnson v State*, 676 SW2d 416, 419 (Tx Crim App, 1984), the defendant expressed a desire to represent himself after the jury had been empanelled but before testimony commenced. The trial court denied the request, and the Texas Court of Criminal Appeals reversed, observing: "[T]here is not anything in this record that would reflect that had the trial judge honored appellant's demand for self-representation at that point in time, this would have caused such a disruption of the proceedings as to have affected the administration of justice." *Id*. at 420. In *State v Wehr*, 852 NW2d 495, 497 (Iowa Ct App, 2014), the defendant sought to dismiss his court-appointed counsel on the morning of trial. The trial court ruled that counsel would continue to represent the defendant. *Id*. at 498. The Iowa Court of Appeals reversed, stating: "Importantly, the district court did not ask [the defendant] if he was requesting a continuance or question [the defendant] to probe for evidence of any dilatory intent. Nor did the district court find [the defendant's] motion was a tactic to delay the start of trial." *Id*. at 502. And in *People v Mogul*, 812 P2d 705, 710 (Colo Ct App, 1991), the Colorado Court of Appeals reversed a trial court's denial of an untimely self-representation motion in part because

> there is no basis in this record for the conclusion that the tardy motion was for the purpose of delay or to gain tactical advantage; neither is there any reason in the record to sustain a belief that granting the motion and proceeding to trial would hinder or obstruct the administration of justice.

When a defendant unequivocally, knowingly and intelligently seeks self-representation during trial, triggering the potential for delay and disruption, a court is entitled to exercise its discretion as to whether to grant the request. Consistent with *Anderson*, that exercise must nevertheless incorporate due consideration for defendant's constitutional right to go it alone.

Here, the trial court initially relied on an improper criterion to deny defendant's request—defendant's lack of legal knowledge and training. The trial court's alternative determination, that self-representation would unduly burden and disrupt the proceedings, supplied a second and independent ground for denying defendant's motion. The trial court's factual findings form the core of the trial court's decision to deny self-representation. The factual record, however, does not support the trial court's ruling. "A finding of fact is clearly erroneous when no evidence supports the finding or, on the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *King v Mich State Police Dep't*, 303 Mich App 162, 185; 841 NW2d 914 (2013). Because the trial court rested its decision on clearly erroneous factual findings, we are left with the definite and firm conviction that the trial court made a mistake, thereby abusing its discretion.

The trial court initially cited the following facts in support of its ruling:

By Defendant's own words, he has not been proceeding as an attorney. He has not been reviewing documents as an attorney. His attorney has been taking care of all of those matters for him. In order to have him adequately prepared for his own defense, the Court would have to stop this proceeding and give him time to view everything through the lens of a lawyer, not through the lens of a defendant assisting his lawyer in his own defense.

When the trial court later returned to the subject, it offered:

The Court's finding in this regard is based on the fact that Defendant acting as his own counsel at this time the Court find would disrupt and unduly inconvenience and burden the court and the administration of the court's business. There would be suddenly on day two of trial after jury selection a different theory of the trial, a different manner of proceeding. Defendant's lack of legal knowledge, while it may not go to his knowing nature and intelligent waiver and voluntary waiver, it certainly goes to the Court - - the anticipation of the Court when the Court considers how long the trial would take, how many disruptions there would be in the trial. The Court has obviously blocked out a certain amount of time for this trial well in advance. This case, again, as indicated earlier, has been in Circuit Court alone since November and to change course now with Defendant indicating he would want to pursue a different strategy, the Court finds would disrupt and inconvenience the court and the administration of the court's business.

In finding that defendant "has not been reviewing documents as an attorney" and that "his attorney has been taking care of all those matters for him," the trial court implied that defendant was unprepared to represent himself at the trial. This finding, however, is rebutted by the record. Defendant claimed that he "thoroughly went through a lot of my paperwork from the time I come in and received paperwork," adding "there's a lot of stuff I received." He further volunteered: "I have a very good memory." Dunfield had previously advised the court that she and defendant

had "many meetings leading up to preparing for this trial," discussed the witnesses and worked together on a witness list, and that she had answered all of defendant's questions and fulfilled his requests.[4] Defendant professed to know the facts of his case better than Dunfield did: "I understand the questions that [the detectives] asked and did not ask, stuff that was presented that they should have presented that was not presented. It's - - like I said, it's a whole truckload of stuff that they don't see that I see and that she doesn't see and that I'd have to explain to her and help her to understand." Contrary to the trial court's finding, the evidence demonstrates that defendant was integrally involved in his defense throughout the months before trial, and prepared to try the case. Defendant was competent to waive counsel that day, and did so in a knowing and intelligent fashion.

Nor do we find any support for the trial court's conclusion that granting self-representation would necessarily entail "stop[ping] this proceeding" to give defendant "time to view everything through the lens of a lawyer[.]" No evidence supports that defendant's inability to view the evidence "through the lens of a lawyer" would change with time. Furthermore, defendant did not condition his self-representation request on an adjournment of the trial, and voiced no interest in delay. Rather, he claimed: "I don't really want to like have anybody up there for a long period of time. I could just cut to the chase and get it out there." None of defendant's statements substantiate that the proceedings would need to be curtailed, or that an adjournment would meaningfully improve defendant's preparation. As the Supreme Court stated in *Anderson*, 398 Mich at 368, "Although the potential for delay and inconvenience to the court may be greater if the request is made during trial, that will not invariably be the case." Absent any request for an adjournment or other accommodation, we are hard-pressed to find a factual basis for a delay or inconvenience.

Similarly, the record lacks any evidence that "[t]here would be suddenly on day two of trial after jury selection a different theory of the trial, a different manner of proceeding." The trial court's questioning and defendant's answers shed no light on how defendant intended to try the case, other than that he would "just cut to the chase and get it out there." Defendant never articulated any other "strategy" that could potentially conflict with Dunfield's.[5] While defendant's lack of legal knowledge would likely make the trial more difficult, this finding proves too much. Every trial involving a self-represented defendant is likely to tax a trial court's patience. It is difficult to comprehend how or why this trial, if conducted pro se, would be less orderly simply because defendant assumed control immediately after jury selection instead of before. And nothing that occurred during the colloquy or the pretrial proceedings hinted that defendant would comport himself in a disruptive fashion.[6]

---

[4] The trial court apparently did not consider the option of granting defendant's motion and retaining Dunfield as standby counsel.

[5] Given that Dunfield had yet to give an opening statement, her "strategy" had not yet been presented to the jury.

[6] Defendant's forensic examiner concluded that he possessed "the capacity to communicate effectively. He comprehended questions posed and provided relevant, detailed, and organized

In finding a need for delay, the trial court may have been understandably and commendably concerned about defendant's ability to present a sound defense. But as we interpret the abundant case law construing *Faretta*, that concern simply cannot trump a defendant's right to execute a knowing, intelligent and voluntary waiver of counsel. Distilled to its essence, *Faretta*, 422 US at 834, vindicates a defendant's constitutional choice to "conduct his own defense ultimately to his own detriment[.]" As Professor Joseph Grano explained five years before *Faretta* was decided, "If a fair trial is possible for a defendant who makes a knowing waiver of counsel in the first instance, it should be equally possible for a defendant who delays waiver until dissatisfaction arises." Grano, *The Right to Counsel: Collateral Issues Affecting Due Process*, 54 Minn L Rev 1175, 1182 (1970). Were we to credit the trial court's concern, we would necessarily ignore *Anderson*'s admonition that even eleventh-hour self-representation requests merit careful consideration, and should be denied only upon a showing of delay and inconvenience.

In summary, the record fails to buttress the trial court's factual finding that allowing self-representation would disrupt, unduly inconvenience, or burden the court. Despite defendant's unequivocal, knowing, intelligent, and voluntary waiver of counsel, the trial court denied his constitutional right to self-representation based on conjecture rather than evidence. Accordingly, the trial court abused its discretion.

The right to self-representation bears no relationship to the likelihood of a different result at trial. In other words, it matters not whether defendant would certainly have lost his case had he been at the helm. *Faretta*, 422 US at 821, instructs that denying a defendant the right to advance his own defense, his way, constitutes structural error. "The right is either respected or denied; its deprivation cannot be harmless." *McKaskle v Wiggins*, 465 US 168, 177 n 8; 104 S Ct 944; 79 L Ed 2d 122 (1984). We must therefore vacate defendant's conviction and sentence and remand for a new trial, at which the court must give careful consideration to the proper factors affecting any request for self-representation.

## III. BINDOVER

Preceding the circuit court's error in addressing defendant's request for self-representation, defendant contends that the district court erred in binding him over for trial on an open murder charge after the preliminary examination. He asserts that there was insufficient evidence that Shaver's death was the result of murder. Even if Shaver were murdered, defendant maintains that insufficient evidence supported his role as the killer and even less evidence supported that defendant engaged in premeditation and deliberation before committing an act that caused death. As a general rule, "the presentation of sufficient evidence to convict at trial renders any erroneous bindover decision harmless." *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010). As we have concluded that defendant is entitled to a new trial, we will review defendant's challenge.

---

responses. He spontaneously clarified information presented during this examination and was forthright with relevant information." Against this backdrop in particular, we find no evidence that defendant was likely to deliberately hinder or obstruct the trial.

The purpose of a preliminary examination in a criminal matter is "to determine whether a felony was committed and whether there is probable cause to believe the defendant committed it." *People v Yost*, 468 Mich 122, 125-126; 659 NW2d 604 (2003), citing MCL 766.13. The district court judge has discretion to determine whether the evidence supports submitting the charge to trial. *Yost*, 468 Mich at 126-127. The evidentiary standard is less rigorous than that required for a conviction after trial:

> At the examination, evidence from which at least an inference may be drawn establishing the elements of the crime charged must be presented. The probable-cause standard of proof is, of course, less rigorous than the guilt-beyond-a-reasonable-doubt standard of proof. Probable cause requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. Yet, to find probable cause, a magistrate need not be without doubts regarding guilt. The reason is that the gap between probable cause and guilt beyond a reasonable doubt is broad, and finding guilt beyond a reasonable doubt is the province of the jury. [*Id.* at 126.]

We first note that the prosecution was not required to present evidence of premeditation and deliberation at the preliminary examination phase to support a bind-over on the open murder charge. See *People v Johnson*, 427 Mich 98, 108; 398 NW2d 219 (1986); *People v Coddington*, 188 Mich App 584, 592-594; 470 NW2d 478 (1991). Rather, the prosecution was required to establish the basic elements of any murder charge. "In Michigan, the corpus delicti of murder requires proof both of a death and of some criminal agency that caused that death." *People v McMahan*, 451 Mich 543, 549; 548 NW2d 199 (1996). As with any offense, the prosecution also had to present evidence tying defendant to the crime. *Yost*, 468 Mich at 125-126.

Circumstantial evidence and inferences arising therefrom are sufficient to support a bind-over decision. Circumstantial evidence can form the basis for determining that a victim's death was the result of homicide. See *People v Gerndt*, 244 Mich 622; 222 NW 185 (1928); *People v Stewart*, 75 Mich 21; 42 NW 662 (1889). Identity of the perpetrator may be established by circumstantial proofs. See *People v Sullivan*, 290 Mich 414, 418; 287 NW 567 (1939); *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). It is also the most useful tool in establishing a defendant's intent when required as an element of the offense. See *People v Hardy*, 494 Mich 430, 440 n 26; 835 NW2d 340 (2013).

In this matter, the district court acted within its discretion in determining that circumstantial evidence and reasonable inferences arising therefrom supported a probable cause determination that Shaver was murdered, that defendant committed the offense, and that defendant maintained some intent consistent with an intentional killing.

The prosecution presented evidence of various motives defendant may have harbored. Defendant and his girlfriend, Cristina Rogers, lived with Shaver and his fiancée, Crystal Gibson, during the time in question. Rogers testified that she and Shaver had begun an affair. Defendant was suspicious and choked and threatened her.

Another motive supplied by the prosecution was defendant's anger over a child sexual abuse allegation levied against him. Gibson had children from a prior relationship and was in the middle of an acrimonious divorce. Her soon-to-be ex-husband accused defendant of molesting his daughter. When CPS came to the house to investigate, they discovered defendant's outstanding warrant for failure to pay child support and instigated his arrest. Defendant blamed his brother for his arrest. To avoid further conflicts with Gibson's husband, Gibson and Shaver agreed to evict defendant and Rogers upon defendant's release from jail. They did not inform defendant of this decision until he returned home, however, increasing the tension between the brothers. Then, Shaver failed to honor his promise to come to the jail on November 18, 2011, and pay $200 bail to secure defendant's release. As a result of Shaver's failure to follow through, defendant entered a written jailhouse contract to give a green Mitsubishi Eclipse to a fellow inmate in exchange for bail money. That vehicle belonged to Gibson, not defendant. Timothy Morin testified that he provided defendant's bail money on his brother, Joseph Morin's, request and then drove the pair to Shaver's home. Defendant had difficulty locating the keys and title and went into the house. Morin believed an argument occurred inside because defendant was agitated when he exited.

The circumstances of Shaver's disappearance were also suspicious. Defendant was the last person to see Shaver alive. He told investigating officers that Shaver drove off in the Mitsubishi at 1:00 a.m. on November 19, 2011. When confronted with the jailhouse vehicle-sale contract, defendant changed his story and claimed that Shaver left on foot in the middle of the night. Defendant told everyone that Shaver had received a call from an aunt in Saginaw who had been in a serious accident and then travelled to Saginaw to assist with this family emergency. Shaver's godmother testified that she was unaware of any family members in Saginaw. Shaver took no personal items with him for this trip. And defendant never explained how Shaver could have travelled to Saginaw without a vehicle.

After Shaver's departure, defendant and Gibson received text messages from Shaver's cell phone. However, Shaver never called anyone to engage in a personal conversation. Defendant told Gibson, Rogers, and investigating officers, that Shaver texted on November 22, and indicated that he had encountered some trouble with unsavory characters. He asked defendant to bring cash, clothes, and a cell phone charger to a Meijer in Kalamazoo where "Javier" would meet him. Defendant claimed that this exchange actually occurred. The November 22 text message conveniently contained a request that defendant protect Gibson and her children from the unidentified villains. Gibson allowed defendant and Rogers to stay in residence as a result. Subsequent January text messages to defendant's phone indicated that Shaver had experienced mechanical problems with the Mitsubishi. Rogers discovered Shaver's cell phone in January or February in a dresser that she shared with defendant. When she questioned defendant about it, he gave her a threatening look. At some point, the phone disappeared. An unrelated party, Donald Burton, discovered Shaver's cell phone in March 2012, on the dirt shoulder of M-140. Burton scrolled through the phone in an attempt to identify the owner and saw pictures of Shaver, who he recognized from recent news reports as the man whose body had been found in a drainage ditch. A separate individual found Shaver's driver's license and two credit cards in Gibson's name along a roadside in another municipality.

That defendant may have played a role in Shaver's disappearance was supported by the fact that he alone learned details of Shaver's plans "directly" from Shaver. He made comments

-19-

to family members that Shaver probably took too many antidepressants while drinking alcohol and had a heart attack. Yet, Shaver was not taking such medication by all accounts. Defendant also told Gibson that Shaver told him that he wanted to enter a facility to deal with alcohol addiction. Moreover, defendant's behavior changed after Shaver's disappearance. Defendant began recording and watching the local news two to three times each day.

The location of Shaver's body aroused further suspicion. Shaver was found in a drainage ditch a "considerable distance" from the road. The road was remote and Shaver knew no one in that area. The location of the body standing alone raised concerns for the medical examiner that Shaver's death was not the result of natural causes. Shaver's cell phone holder was still attached to his clothes, but his phone was gone. Shaver's body was partly decomposed and had experienced water damage. The medical examiner could not determine the cause of death, but there was no evidence of blunt force trauma or that Shaver was stabbed or shot. Shaver's toxicology report was unremarkable. He had a low blood alcohol content that could have been the natural result of decomposition. No trace of medications or narcotics was found in his system. There was also no evidence of a fatal heart event. Given decomposition in the neck area, the medical examiner could not rule out strangulation or suffocation as the cause of death.

From this evidence, the district court could find probable cause that Shaver's death was the result of homicide. The location of the body and disbursement of his personal effects suggested that someone tried to hide Shaver's body and cover up his disappearance. Various factors created an inference that defendant played a role in Shaver's disappearance and death: defendant's possession of Shaver's cell phone during a time when "Shaver" was allegedly communicating via text message, the illogical explanations for Shaver's absence, the fact that defendant alone met the mysterious "Javier" to deliver items to Shaver, defendant's lies about the green Mitsubishi, the various reasons defendant harbored ill will toward his brother, the fact that defendant was the last person to see Shaver alive, and defendant's new-found obsession with the local news before there was any reason to suspect foul play. The evidence even supported an inference of premeditation and deliberation: the most likely causes of death—strangulation or suffocation—are both slow means of death during which a defendant can rethink his actions. *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003). Accordingly, we discern no impropriety in the decision to bind defendant over for trial on an open murder charge.[7]

---

[7] Defendant also challenges the circuit court's failure to dismiss the charge against him at the close of the prosecution's case-in-chief and the propriety of the prosecutor's statements during closing arguments. As we have vacated defendant's conviction and remanded for a new trial, these issues are now moot.

We vacate defendant's conviction and sentence and remand for a new trial consistent with this opinion.  We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Stephen L. Borrello
/s/ Elizabeth L. Gleicher